## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) JURY DEMAND |
| | ) |
| AMERIS BANK, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## COMPLAINT

## INTRODUCTION

1.      The United States of America (the "United States") brings this action against Ameris Bank ("Ameris" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f.

2.      The FHA and ECOA prohibit creditors, such as banks, from discriminating in home loans or other residential credit transactions on the basis of race, color, national origin, and other characteristics.

3.      "Redlining" is one type of discrimination prohibited under the FHA and ECOA.  Redlining occurs when lenders deny or discourage applications or avoid providing loans and other credit services in neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4.      From 2016 through 2021 (the "Relevant Time Period"), Ameris Bank engaged in a pattern or practice of unlawful redlining.  As alleged in detail herein, Ameris avoided providing home loans[1] and other mortgage services in majority-Black and Hispanic[2] neighborhoods in the Bank's self-designated assessment area in Jacksonville, Florida ("Jacksonville assessment area").

5.      Ameris' redlining practices included locating and maintaining nearly all of its branch locations in majority-white neighborhoods in the Bank's Jacksonville assessment area.  The Bank's mortgage loan officers also targeted majority-white areas to generate loan applications and avoided marketing, advertising, and outreach in majority-Black and Hispanic areas.  Further, although the Bank knew about its increased redlining risk in Jacksonville, Ameris failed to take adequate corrective action to ensure that the Bank provided equal access to majority-Black and Hispanic neighborhoods.  As a result of these practices, the Bank generated disproportionately low numbers of loan applications and home loans from majority-Black and Hispanic neighborhoods in its Jacksonville assessment area compared to similarly-situated lenders.

6.      Ameris' conduct and practices were intended to deny, and had the effect

---

[1] For purposes of this Complaint, the terms "mortgage loans" or "home loans" refer to loans that Ameris and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2810, and "mortgage lending" refers to providing those loans.

[2] As used in this Complaint, a "majority-Black and Hispanic" tract is one where more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau.  The Complaint uses "majority-Black and Hispanic tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably.  The Complaint does the same for "majority-white tract," "majority-white area," and "majority-white neighborhood."

of denying, equal access to home loans to residents of majority-Black and Hispanic neighborhoods in the Bank's Jacksonville assessment area, and those seeking credit for properties located in those neighborhoods, and otherwise discouraged those individuals from applying for home loans on the basis of the race, color, or national origin of the residents of the majority-Black and Hispanic neighborhoods. The Bank's conduct was not justified by a business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h) because the action arises under the laws of the United States, and the United States brings this case as a plaintiff.

8.     Venue is proper in this Court under 28 U.S.C. § 1391 and in this division because a substantial part of the events or omissions giving rise to the claims occurred in this District and division.

## PARTIES

9.     Plaintiff the United States brings this action to enforce the provisions of the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights

to a group of persons and that denial raises an issue of general public importance.  42 U.S.C. § 3614(a).

10.     Defendant Ameris Bank is a state-chartered financial institution headquartered in Atlanta, Georgia, subject to the regulatory authority of the Federal Deposit Insurance Corporation ("FDIC") and the Consumer Financial Protection Bureau ("CFPB").

11.     As of December 31, 2022, Ameris' total assets were over $25 billion.

12.     The Bank currently maintains 164 full-service branches and 32 loan production offices across nine southeastern and mid-Atlantic states.

13.     The Bank currently operates 18 branches in Jacksonville. In 2019, Jacksonville was the Bank's largest market for residential mortgages by loan dollars.

14.     Ameris is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100, 12 C.F.R. pt. 1002.

15.     Ameris is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and is engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### Ameris' Jacksonville Assessment Area

16.     As a depository bank, Ameris is subject to the requirements of the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, and its enabling regulations, which require that regulated financial institutions serve the credit needs of the communities that they serve.  Each bank subject to the CRA is required to self-

identify the communities that it serves in the bank's "assessment area." Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community.

17. From 2016 until July 2019, Ameris' self-designated CRA assessment area in Jacksonville consisted of three contiguous counties: Clay, Duval, and St. Johns. After a merger in 2019, Ameris expanded its assessment area to include Baker County. *See* **Exhibit A**. In 2019, the assessment area comprised 246 populated census tracts and had over 1.4 million residents.

18. According to data from the United States Census Bureau, in 2019, the demographic breakdown of the Bank's Jacksonville assessment area was 61.5 percent non-Hispanic white ("white"), 21.9 percent Black or African-American ("Black"), 9.1 percent Hispanic or Latino, 3.9 percent Asian, and 2.9 percent two or more races.

19. The City of Jacksonville is located within Duval County and contains a majority of the population within the assessment area. The assessment area's Black and Hispanic populations largely reside in Duval County, where they account for 38.8 percent of the County's residents.

20. All of the 48 majority-Black and Hispanic census tracts within the Bank's Jacksonville assessment area are located in Duval County. Most of the majority-Black and Hispanic tracts in the assessment area are located in and around downtown Jacksonville. Ameris describes this area as the "urban core."

**Ameris' Jacksonville Branches Are Concentrated in
Majority-White Neighborhoods**

21.     During the Relevant Time Period, Ameris located its branches in its Jacksonville assessment area so as to serve the credit needs of residents in majority-white neighborhoods and avoid serving the credit needs of residents in majority-Black and Hispanic neighborhoods.

22.     Ameris currently operates 18 full-service branches in its Jacksonville assessment area.  *See* **Exhibit A**.

23.     Ameris does not have, and has never had, a branch located in a majority-Black and Hispanic census tract in its Jacksonville assessment area, even though the majority-Black and Hispanic census tracts represent nearly 20 percent of the overall census tracts in the assessment area.

24.     In January 2019, as part of an "efficiency initiative" prior to a merger, Ameris closed two branches in census tracts that it had identified as having "minority" populations "higher" than adjacent Ameris branch locations.  Ameris did not close any branches in white areas of its Jacksonville assessment area as part of the efficiency initiative.

25.      One of the branches closed, the "downtown branch," was located within what Ameris referred to as the "urban core" and was the closest branch to most of the majority-Black and Hispanic tracts in Jacksonville.  At the time of its closure, the downtown branch was rated one of Ameris' "best financial performers" of all of its branches in the United States.

26.    Prior to closing the branches, Ameris performed an internal CRA analysis to assess the effect of the branch closures on the Bank's CRA score.  The CRA score is the FDIC's assessment of Ameris' compliance with the CRA, including the Bank's obligation to meet the credit needs of the communities it serves.  Ameris determined that both branch closures would have a negative impact on its CRA score.

27.    At the time of that analysis and when Ameris closed the branches, Ameris already knew that, in years prior, the Bank had originated zero loans in most of what Ameris called the "urban core." Ameris knew or should have known from its internal CRA analysis that its branch closures would further deprive those same communities of equal access to credit services.

28.    After the branch closures, Ameris did not take any action to increase or supplement its outreach or advertising to the affected communities to ensure it was reaching majority-Black and Hispanic communities and serving the credit needs of its entire community, except for one email campaign in 2019 where Ameris sent emails to already-existing customers living in majority-Black and Hispanic communities.

29.    The remaining sixteen Ameris branches were not readily accessible to the population living in majority-Black and Hispanic tracts.  All but two of Ameris' branches in Duval County were separated from most majority-Black and Hispanic communities by the St. Johns River.  Ameris was aware and has acknowledged in internal documents that the St. Johns River is an impediment to providing service to customers and has found it "not reasonable to conclude" that customers could be

serviced by a branch across the river.

30.     At the time of the branch closures and today, the two Ameris branches left to serve the entire north and west side of the river in Duval County are located at least five miles from the "urban core," where most of the majority-Black and Hispanic neighborhoods are clustered.

31.     Ameris knew its branches were not serving the credit needs of majority-Black and Hispanic areas in its Jacksonville assessment area, but did not take steps to address this failure.

32.     By concentrating nearly all of its branches in majority-white areas in its Jacksonville assessment area, Ameris discouraged residents of majority-Black and Hispanic areas from applying for and obtaining home loans from Ameris and restricted their access to the Bank's credit and mortgage lending services.

### Ameris Relied on Mortgage Bankers Who Served Majority-White Neighborhoods, But Not Majority-Black and Hispanic Neighborhoods, in its Jacksonville Assessment Area

33.     During the Relevant Time Period, Ameris' mortgage bankers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority-Black and Hispanic neighborhoods in its Jacksonville assessment area.

34.     Ameris has a policy or practice of relying primarily on its mortgage bankers to generate residential mortgage loan applications by developing referral sources and conducting outreach to build local relationships.  Mortgage bankers are not assigned to generate applications from specific geographic areas within the Jacksonville assessment area.  Ameris' mortgage bankers have unsupervised

discretion to decide from where to solicit applications.

35.     The Bank did not monitor or document where its mortgage bankers developed referral sources or to whom mortgage bankers distributed marketing or outreach materials related to mortgage lending services to ensure that such sources or distributions occurred in all neighborhoods throughout the Jacksonville assessment area.

36.     In July 2018, Ameris' Compliance Department recommended to the Mortgage Division that its mortgage bankers build partnerships with local realtors and community partners to improve lending in high-minority communities and low- and moderate-income communities and that the Mortgage Division conduct mortgage banker training.

37.     In response to the Compliance Department's recommendations, Ameris created a CRA mortgage banker position.[3]  Ameris' Chief Executive Officer offered this specialized CRA mortgage banker job to a person who did not apply for or seek out the role, had no banking experience or relevant background knowledge, and no familiarity with or connections to Black or Hispanic neighborhoods in Jacksonville. During his approximately one year and seven months in the role, the CRA mortgage banker did not originate a single loan.  Nor did he perform any outreach or distribute any marketing materials to majority-Black and Hispanic communities.  In or around March 2020, the CRA mortgage banker was transitioned to an internal lending role.

---

[3] CRA mortgage bankers are specialized loan originators tasked with generating business in communities of color and low- and moderate-income areas.

Ameris did not fill the CRA mortgage banker role for the remainder of the Relevant Time Period.

38.    The Bank took no meaningful steps, apart from any steps that may have been taken independently by any of its mortgage bankers, to generate mortgage loan applications from majority-Black and Hispanic communities in its assessment area.

39.    Ameris' failure to assign any mortgage bankers to majority-Black and Hispanic areas, failure to supervise its mortgage bankers to ensure coverage of the assessment area, and failure to take any meaningful efforts to compensate for its lack of branches or outreach in majority-Black and Hispanic neighborhoods, was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods in its Jacksonville assessment area.

### Ameris' Marketing Targeted Majority-White Neighborhoods and Avoided Majority-Black and Hispanic Neighborhoods

40.    During the Relevant Time Period, Ameris targeted some advertising efforts to majority-white areas but made no or minimal efforts to similarly target advertising to majority-Black and Hispanic areas in its Jacksonville assessment area.

41.    As alleged above, Ameris' practice was to rely primarily on its mortgage bankers to conduct outreach and marketing and to solicit applications in the Jacksonville assessment area.  During the Relevant Time Period, Ameris' mortgage bankers conducted outreach and marketing to generate loans in majority-

white neighborhoods but did not do so or otherwise serve the credit needs of majority-Black and Hispanic neighborhoods within its assessment area.

42.    Ameris' corporate marketing division advertises across all the Bank's markets, focusing on branding and website traffic.  During the Relevant Time Period, Ameris' corporate marketing division selected some media channels that reached the entire assessment area, including television, radio, and print.  However, Ameris also targeted specific majority-white areas within the assessment area but did not target majority-Black and Hispanic tracts.

43.    Ameris focused its billboard marketing in white areas.  For example, in 2019 and 2020, Ameris placed six advertisements on billboards in the Jacksonville assessment area in majority-white tracts; Ameris did not advertise on any billboards located in majority-Black and Hispanic tracts.  Ameris selected the billboard locations based on availability and proximity around branch locations, a selection process which excluded majority-Black and Hispanic neighborhoods because Ameris does not have and has never had a branch located in a majority-Black and Hispanic tract.

44.    In 2020, Ameris sent a "free checking mailer" that the Bank stated was targeted toward low- and moderate-income areas and majority-minority census tracts.[4]  Ameris mailed approximately 22,759 postcards with images of white models to 13 zip codes throughout its Jacksonville assessment area, predominantly in areas around its branches.  Of those postcards, approximately 96.5 percent were sent to

---

[4] A "majority-minority" census tract is a residential census tract where more than 50 percent of the residents are identified as non-white by the United States Census Bureau.

majority-white tracts and only 3.5 percent of the postcards were sent to a single majority-minority tract.  Not one postcard was sent to a single resident living in a majority-Black and Hispanic tract.  *See* **Exhibit B**.  None of the postcards were sent to the area that Ameris calls the "urban core."

45.    Ameris' practice of concentrating its billboard, direct mail and other marketing in areas around its branches resulted in little marketing in majority-Black and Hispanic neighborhoods.  Ameris' marketing efforts discouraged residents and prospective applicants in majority-Black and Hispanic neighborhoods from seeking credit from Ameris in its Jacksonville assessment area and did not provide equal access to credit for those residents.

**Ameris Failed to Address Known Redlining Risk**

46.    During the Relevant Time Period, Ameris' internal compliance management system was inadequate to ensure that the Bank provided equal access to credit to majority-Black and Hispanic neighborhoods in its Jacksonville assessment area.

47.    As early as 2016, Ameris knew that its internal redlining analysis was insufficient to identify and measure redlining risk, but it did not revise its monitoring practices until 2018.

48.    In May 2018, using its revised analysis, an Ameris report identified 44 low- and moderate-income or high-minority[5] tracts where other lenders originated

---

[5] A "high-minority" census tract is a residential census tract where more than 80 percent of the residents are identified as non-white by the United States Census Bureau.

loans in 2017, but Ameris originated zero.  All tracts identified as high-minority in the 2018 report are also majority-Black and Hispanic tracts, according to United States Census Bureau data.  Indeed, this list of tracts where Ameris generated zero loans included 38 of the assessment area's 48 majority-Black and Hispanic tracts.

49.     In the May 2018 report, Ameris' Fair Banking Manager recommended that Ameris' mortgage bankers increase outreach and community partnerships in low- and moderate-income and high-minority communities and to conduct mortgage banker training.

50.     In July 2018, the Compliance Department met with the President of Mortgage Services to discuss the Fair Banking Manager's recommendations.  For the remainder of the Relevant Time Period, the Bank failed to take effective actions to implement these recommendations.

51.     In January 2019, Ameris carried out the two branch closures alleged above, including closing the "downtown branch."  The downtown branch was the most accessible branch to the "urban core" majority-Black and Hispanic neighborhoods – the same neighborhoods that Ameris knew it was not serving based on the May 2018 report.

52.     Also in January 2019, Ameris' Compliance Department compiled a report on the Bank's lending in Duval County's "urban core."  The report stated that, in 2017, of the loans that Ameris did originate in "urban core" high- minority tracts, only two of those loans were made to Black borrowers and zero loans were made to Hispanic borrowers.

53.     The January 2019 report also showed that the Bank's originations for year 2018 were on a similar trajectory as 2017.  As of September 2018, Ameris had originated zero loans in 76.5 percent of the "urban core" high-minority tracts.

54.     Thereafter, every internal fair lending monitoring report within the Relevant Time Period in Jacksonville, showed that Ameris' lending performance did not meaningfully improve and often worsened in majority-minority tracts and high-minority tracts, relative to the Bank's peers.

55.     Throughout the Relevant Time Period, Ameris failed to respond adequately to its own reports indicating that it was underserving majority-minority and high-minority neighborhoods and failed to follow the recommendations of the Compliance Department, despite having knowledge of its redlining risk.

56.     During the Relevant Time Period, Ameris was aware of its redlining risk in majority-Black and Hispanic tracts in Jacksonville, but failed to take adequate corrective action to address the risk.

**Ameris' Actions Led to Disproportionately Low Home Loan Applications from Majority-Black and Hispanic Neighborhoods in the Jacksonville Assessment Area**

57.     Ameris' policies and practices alleged herein have discriminated against and discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods in its Jacksonville assessment area from applying for and obtaining home loans and other mortgage-related services.

58.     Ameris' lending demonstrated a pattern of disproportionately failing to serve majority-Black and Hispanic neighborhoods in its assessment area, when

compared with its peer lenders.

59.     Ameris' own data on loan applications and originations, which it is required to report to its regulator under HMDA, confirms that Ameris has avoided serving majority-Black and Hispanic neighborhoods in its Jacksonville assessment area.  *See* **Exhibit C**.

60.     During the Relevant Time Period, Ameris significantly underperformed its "peer lenders" in generating home mortgage loan applications from majority-Black and Hispanic areas within the Bank's assessment area.[6]  "Peer lenders" are similarly-situated financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home mortgage loan applications.

61.     Indeed, during the entire six-year Relevant Time Period, Ameris did not obtain a single loan application in one-third of majority-Black and Hispanic tracts in its Jacksonville assessment area – areas where peer lenders received applications.  *See* **Exhibit D**.

62.     The disparity between the rate of applications generated by Ameris and the rate generated by its peer lenders from majority-Black and Hispanic areas is both statistically significant – meaning unlikely to be caused by chance – and sizable across the Relevant Time Period.

63.     During the Relevant Time Period, Ameris received 6,229 HMDA-

---

[6] All statistical analyses referenced in this Complaint were conducted using Ameris' current four-county assessment area.  Results for the years 2016 to 2019 are substantially similar when conducted using Ameris' former three-county assessment area.

reportable mortgage loan applications within its Jacksonville assessment area. Of those applications, only 220 or 3.5 percent came from residents of majority-Black and Hispanic census tracts. By contrast, during the same time period, Ameris' peers generated 10.8 percent of their HMDA applications from these same majority-Black and Hispanic census tracts. These disparities are statistically significant across the six-year period and in every year analyzed.

64.     In other words, from 2016 through 2021, Ameris' peers generated applications from residents of majority-Black and Hispanic census tracts at over three times the rate of Ameris.

65.     The statistically significant disparities between applications Ameris generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were residents in majority-Black and Hispanic areas in the Jacksonville assessment area who were seeking home loans. Ameris had no legitimate, non-discriminatory reason to draw so few applications from these areas.

66.     These figures show a statistically significant failure by Ameris, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents of majority-Black and Hispanic census tracts in its Jacksonville assessment area on a non-discriminatory basis during the Relevant Time Period.

**Ameris' Actions Led to Disproportionately Low Home Loan Originations from Majority-Black and Hispanic Neighborhoods in the Jacksonville Assessment Area**

67.     Ameris' lending practices have discouraged applicants and prospective

16

applicants in majority-Black and Hispanic neighborhoods in the Jacksonville assessment area from seeking home loans. As a result, the Bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers across the Relevant Time Period. *See* **Exhibit E**.

68.     The disparity between the rate of home loans that Ameris made and the rate made by its peer lenders in majority-Black and Hispanic neighborhoods in its assessment area was both statistically significant and sizable in every year from 2016 through 2021.

69.     During the Relevant Time Period, Ameris made 4,178 HMDA-reportable residential mortgage loans in its Jacksonville assessment area. Of those loans, only 114, or 2.7 percent were made to residents of majority-Black and Hispanic census tracts. By contrast, Ameris' peers made 9.5 percent of their HMDA loans from these same majority-Black and Hispanic census tracts.

70.     In other words, from 2016 through 2021, Ameris' peer lenders made home loans in majority-Black and Hispanic areas at approximately three and a half times the rate of Ameris.

71.     The statistically significant disparities between the number of home loans Ameris made in majority-Black and Hispanic neighborhoods and those that its peers made show that there were residents in majority-Black and Hispanic areas in its Jacksonville assessment area who were seeking and qualified for home loans. Ameris had no legitimate, non-discriminatory reason to make so few home loans in these areas.

72.     These figures show a statistically significant failure by Ameris, relative to its peer lenders, to make home loans and provide residential mortgage services to residents of majority-Black and Hispanic census tracts in its Jacksonville assessment area on a non-discriminatory basis during the Relevant Time Period.

## COUNT I – VIOLATIONS OF THE FAIR HOUSING ACT

73.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

74.     Ameris' policies and practices constitute the unlawful redlining of majority-Black and Hispanic communities in its Jacksonville assessment area, on account of the racial, color, and national origin composition of those communities. Ameris' policies and practices were intended to deny, and had the effect of denying, equal access to home loans to residents of majority-Black and Hispanic communities and those seeking credit for properties located in those communities.   Ameris' conduct was not justified by business necessity or legitimate business considerations.

75.     Ameris' actions as alleged herein constitute:

   a.     Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulations, 24 C.F.R. §§ 100.110(b), 100.120;

   b.     The making unavailable or denial of dwellings to persons because

of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3);

    c.    Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65; and

76.    Ameris' policies and practices as alleged herein constitute:

    a.    A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

    b.    A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general importance.

77.    Ameris' pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

78.    Persons who have been victims of Ameris' discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of the Bank's conduct in violation of the Fair Housing Act, as described above.

## COUNT II – VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

79.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

80.     Ameris' acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities in its assessment area and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, or national origin in violation of ECOA and Regulation B.  15 U.S.C. § 1691 *et seq.*; 12 C.F.R. § 1002.4(a)-(b).

81.     Ameris' policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by ECOA, in violation of the Act. 15 U.S.C. § 1691e(h).

82.     Ameris' pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

83.     Persons who have been victims of Ameris' discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. § 1691e(i), and may have suffered damages as a result of Ameris' conduct in violation of ECOA, as described above.

### REQUEST FOR RELIEF

WHEREFORE, the United States prays that the Court enter an order that:

(1)     Declares that the conduct of Defendant Ameris Bank violated the Fair

Housing Act;

(2)     Declares that the conduct of Defendant Ameris Bank violated the Equal Credit Opportunity Act;

(3)     Enjoins Defendant, its agents, employees, and successors, and all other persons in active concert or participation with Defendant, from:

> A.   Discriminating on account of race, color, or national origin in any aspect of their lending business practices;
>
> B.   Discouraging applicants on account of race, color, or national origin;
>
> C.   Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;
>
> D.   Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's areas assessment areas are served without regard to prohibited characteristics;

(4)     Awards monetary damages against Defendant in accordance with 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(5)    Assesses a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6)    Awards the United States any additional relief the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable.

Dated:  October 19, 2023

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney
Middle District of Florida


 */s/ Yohance A. Pettis*
YOHANCE A. PETTIS
Deputy Chief
Florida Bar No.: 021216
MICHAEL R. KENNETH
Florida Bar No.: 44341
Assistant United States Attorney
United States Attorney's Office
Middle District of Florida
400 N. Tampa Street, Suite 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6198
Yohance.Pettis@usdoj.gov
Michael.Kenneth@usdoj.gov

MERRICK B. GARLAND
Attorney General

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division


CARRIE PAGNUCCO
Chief
LUCY G. CARLSON
Deputy Chief
JENNA A. RADEN, DC Bar No.: 1724701
Trial Attorney
Housing & Civil Enforcement Section
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Phone: (202) 305-5452
Fax: (202) 514-1116
Jenna.Raden@usdoj.gov


Attorneys for United States of America